UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No. 21 Cr. 73-1 (BAH) |
| v. | : | |
| NICHOLAS DECARLO | : | |
| Defendant. | : | |

**DEFENDANT'S MEMORANDUM**
**IN AID OF SENTENCING**

**INTRODUCTION**

Defendant Nicholas DeCarlo is currently pending sentencing before this Court after entering a guilty plea to Count Two of the Indictment, which charges him with Obstruction Of An Official Proceeding, in violation of 18 United States Code Section 1512(c)(2). The written Plea Agreement calculated the defendant's Adjusted Sentencing Guideline as Level 22, which corresponds to a range of 41-51 months. The Probation Office concurs in that calculation. The Government has asked this Court to impose a 48-month sentence, near the upper end of the guideline range.

As explained in greater detail in this memorandum, while punishment is necessary for the defendant's participation in the events at the Capitol on January 6, 2021, the Government is asking for more time than is warranted under the circumstances. As set forth herein in greater detail, the defense objects to the

Government's argument that the defendant's membership in the Proud Boys is a basis for imposing the requested sentence. As the Court can readily determine from both the agreed upon Statement of Facts in this case, as well as the photographic and video evidence, the defendant did not travel to the Capitol as a member of the Proud Boys, a group that he resigned from in 2019. He did not wear their distinctive clothing; he did not coordinate with other Proud Boy members (other than his co-defendant) prior to coming to Washington D.C.; and more importantly, he did not participate in any of the organized violence attributed to the group. In addition, while the Government argues that Mr. DeCarlo acted with "glee" during the riot, that adverb misapprehends the defendant's intent. While Mr. DeCarlo's insouciant/sarcastic nature and comments before, during, and after the events are blameworthy, he did not evince the angry, nihilistic demeanor displayed by a significant number of the other January 6 defendants. Indeed, Mr. DeCarlo has expressed remorse for his conduct, as explained in his letter to the Court that is attached hereto as Exhibit 1. Moreover, in order to help make amends, the defendant voluntarily participated in a lengthy interview with the House Select Committee investigating the January 6, 2021 attack.

Finally, the sentence requested by the Government would create an unwarranted disparity with other similarly situated defendants sentenced by both this Court and by other judges in this jurisdiction. For example, this Court

sentenced defendant Greg Rubenacker in case 21 Cr. 193 to forty-one months of incarceration after he entered a guilty plea to: (1) obstruction of the electoral college vote certification; (2) resisting and/or assaulting law enforcement officers; and (3) eight other criminal charges. Similarly, Matthew Bledsoe, defendant in case 21 Cr. 204, who was convicted after a jury trial of obstructing the vote certification (and other charges) after he scaled the walls of the Capitol Building, and then testified falsely in his own defense, was sentenced by this Court to 48 months in jail, despite his lack of remorse and failure to comply with release conditions. Finally, Judge Walton recently sentenced Duston Thompson, defendant in case 21 Cr. 161, who was also convicted at a jury trial of obstructing the electoral certification (and other charges) after he entered the Capitol, ransacked the Office of the Parliamentarian, stole a coat rack and then testified falsely in his own defense. Although the Government requested a sentence of 70 months, the Court imposed only 36 months of incarceration.

This Memorandum also includes a chart that contains relevant sentencings for other similarly situated defendants in this jurisdiction.

For all of these reasons, and after a consideration of all the factors set forth in 18 United States Code Section 3553(e), the defense asks that this Court impose a sentence of 18 months, followed by three years of Supervised Probation. The requested period of incarceration would more than satisfy the paramount

consideration that the sentence imposed be "sufficient, but no greater than

necessary" to punish. Kimbrough v. United States, 552 U.S. 85, 101 (2007).

## LEGAL OVERVIEW

**1. This Court Has The Discretion To Impose A Below Guidelines Sentence**

In the final analysis, the Adjusted Sentencing Guideline Calculation in any

particular case is no longer outcome determinative. As counsel repeatedly notes in

sentencing memoranda, federal judges are no longer relegated to the status of

"automatons," armed with calculator and pencil and the federal sentencing

guidelines manual. The change in sentencing law began with the Supreme Court's

conclusion almost a decade ago in United States v. Booker, 542 U.S. 220 (2005),

that the federal sentencing guidelines were not mandatory, but merely advisory

upon the district courts. The change occasioned by *Booker* has grown

exponentially; thus, while a sentencing court will generally begin its analysis with

consideration of the relevant guideline range, it "should" entertain arguments from

the parties as to whether a non-guidelines sentence is appropriate. Rita v. United

States, 551 U.S. 338, 351 (2007). In making this decision, the trial court will

generally consider the sentencing factors set forth in 18 U.S.C. Section 3553(a).

Kimbrough v. United States, 552 U.S. 85, 109 (2007). Without doubt the district

courts have the discretion to impose a non-guideline sentence based upon their

assessment of each individual case. See Gall v. United States, 552 U.S. 38, 47-48

(2007)(abuse of discretion standard applies to review of sentence outside guideline range and there is no mathematical test for reasonableness of sentence).

That analysis thus begins with the calculation of the adjusted sentence guideline calculation.

## Presentence Report Adjusted Guideline Calculation

In this case the written Plea Agreement entered into between the parties computed the defendant's guideline calculation as follows:

| | |
|---|---|
| Base Offense Level (18 USC 1512) | 14 |
| Attempted Damage To Property or Person | 8 |
| Substantial Interference With Administration of Justice | 3 |
| Downward Adjustment Acceptance of Responsibility | -2 |
| Early Entry of Plea | -1 |
| Criminal History Category I | |
| | _____ |
| Adjusted Total Offense Level | 22 |
| | (41-51 months) |

The Probation Office concurs with this sentencing calculation.

## Sentencing Guideline Factors

Once the adjusted guideline offense level has been calculated, the Court then turns to a consideration of the following statutory sentencing factors: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need for the sentencing to reflect the seriousness of the offense, to promote respect for law, and to provide just punishment; (3) specific and general deterrence; (4) the need to provide the defendant with training, medical care, or

treatment; available sentencing alternatives; (5) consistency in sentencing among similarly-situated defendants; and (6) the need to provide restitution. See 18 U.S.C. § 3553(a).

The following sections address those considerations.

### 1. *Defendant's Personal Characteristics*

Nicholas DeCarlo is thirty-two years-old, who has never been married and has no children. The defendant was raised in a middle-class family with his four siblings in rural Texas. According to his mother, Mr. DeCarlo was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) as a child; by his own admission, he had trouble with formal education and dropped out of high school when he was 18 years old. Prior to this case, the defendant spent most of his life working at a variety of minimum wage jobs in grocery stores or fast-food chain restaurants. After his arrest, however, in an effort at self-improvement, the defendant obtained a certification from North Texas University and worked from September 2020 until June 2022, training special needs children in Fort Worth, Texas. He then took a position at an automobile repair company in Tennessee, but was terminated because his employer concluded that he could not wait until the defendant was sentenced to replace him. As a result, Mr. DeCarlo is now again living with his parents in Texas and working as the manager of a chain restaurant.

The defendant has one arrest from 2018 for possession of marijuana, but the charges were dismissed. He has been on pre-trial release since his arrest in this case in February 2021 and has been in complete compliance with his release conditions.

The defendant acknowledges that he became a member of the Proud Boys Dallas Fort Worth Chapter in in 2017, but he is adamant that resigned from the organization in 2019 because it was becoming "too political." Mr. DeCarlo is well aware that his prior membership in the Proud Boys will have lifelong consequences; if nothing else, he had the words Proud Boys" tattooed on his left arm. The defendant is emphatic, however, that he left the Proud Boys in 2019 and the Government's effort to connect him to the group thereafter is based upon nothing more than conjecture, suspicion, and innuendo and ought to be rejected by this Court. [1]

---

[1] The Government notes that the defendant stated he was "in contact" with Enrique Tarrio, the head of the Proud Boys, in December 2019. The Government has no idea whether the two men actually spoke and if so, what was the topic of conversation. Similarly, the prosecution states that based upon data collected from his cellular phone, Mr. DeCarlo "called" another Proud Boy leader the day that the former President announced that he would be speaking on the Mall on January 6, 2021. Again, the Government does not state if the data reveals the two men actually spoke and the prosecution makes no representation as to the nature of any such conversation. Similarly, the Government points out that the defendant "warmly greeted" other Proud Boys that he encountered at the Capitol on January 6, but does not allege that they planned to meet or that there was anything nefarious about their interactions. Finally, the Government argues that chats on an "encrypted" application mention the defendant being considered for a position as an "Elder." Remarkably, the Government does not allege – because it cannot – that the defendant participated in the encrypted chats, or that they have any evidence to establish that Mr. DeCarlo was interested in the position. See DE 93 (Gov't Sentencing Memorandum) at pp. 31-32.

The defendant was also an aspiring media influencer. In January 2019, he (and a friend) created a company called "Murder The Media" and self-promoted himself on various social media platforms, adopting the "on air" persona of an arrogant, pedantic interviewer. The motivation for the defendant's trip to Washington, D.C. (which was paid for by his colleague) was in large measure with the hope that it would help raise the profile of his company and he had hoped to conduct interviews with right wing personalities that announced they would be present to hear the former President's planned January 6, 2021 speech. That decision ultimately led him to be before the Court for sentencing in this criminal case.

## 2. *The Nature and Circumstances Of The Offense*

The circumstances of the defendant's conduct on January 6, 2021, are well documented; he admitted to a lengthy Statement of Facts in this case and his travels to, from, and after entering the Capitol are documented in Mr. DeCarlo's social media accounts. The morning of January 6, 2021, the defendant and his co-defendant Nicholas Ochs, traveled from their hotel in Virginia to Washington, D.C. Defendant DeCarlo did not consult with other members of the Proud Boys prior to traveling, he did not plan to commit violence, and indeed, was worried that he would be the victim of violence by anti-right wing protestors, which is why he texted a friend the night before that he was going to duct tape magazines around

his torso. Dressed in a white fedora and a red scarf, the defendant walked with a crowd of others towards the United States Capitol. He livestreamed the trip, adding his own commentary as he traversed the City.

The defendant and Mr. Ochs arrived at the West Side of the Capitol and watched a crowd assemble and confront police officers, pushing them back towards the building. They filmed the events with a running commentary; at one point Mr. DeCarlo responded to the crowd's cheer of "our House" by singing the refrain from the 1980s song of the same name: "our house, in the middle of the street." Ultimately, someone in the crowd handed the defendants what defendant DeCarlo describes as a "novelty" smoke cannister, which he ultimately threw into the crowd in the direction of a group of police officers, without (in his own words) "pulling the pin." Shortly thereafter, the defendants entered the Capitol through the Upper West Terrace doors. The defendant had no intention of harming anyone.

Once inside, the defendant walked through various hallways, randomly encountering other members of the Proud Boys, before coming back to the Rotunda. They ultimately left the building approximately and hour and a half after then entered the Capitol. [2] Before leaving the area, however, the defendants walked

---

[2] The Government's narrative of the facts notably intermixes the defendant's conduct, with that of other persons who entered the Capitol. For example, the Government notes that after the defendants entered the Rotunda:

A group of rioters soon gathered there, including Richard Barnett (the defendant in *United States v. Barnett,* 21-cr-38 (CRC), who was photographed that day with his feet

around its exterior and found a duffle bag that had been left behind by a Capitol Hill police officer. Defendant DeCarlo removed one set of plastic flex-cuffs from the bag and then a magic marker. In what may well be regarded as a quintessential "what in the world were you thinking" moment, the defendant proceeded to write the motto of his company "Murder The Media," on what the Government identifies as the "Chestnut-Gibson Memorial Door." Fortunately, the damage, while sophomoric, was neither permanent, nor expensive to repair. The Government estimated the repair cost to be ninety-eight dollars.

That evening defendant DeCarlo gave a satirical, but ill-advised interview that was posted on YouTube, repeating the day's events with a mixture of false bravado and in some instances, flat out lies. In the end, the defendant was arrested on January 26, 2021 in his home in Texas; the FBI recovered a photograph of the defendant and Mr. Ochs standing in front of the Capitol door with the words "Murder The Media" scrawled on it, as well as the flexicuffs taken from the building.

---

on Speaker Pelosi's desk), who yelled at officers that he had left his flag behind in her office and wanted it back. Police, their backs to a stairway, tried to keep the rioters from advancing, but the rioters shoved forward, threatening to push the officers down the stairs before reinforcements arrived and the rioters were repelled.

See DE 93 (Gov. Sentencing Memorandum) at p.18. Defendant DeCarlo admitted responsibility for his own acts, but he is not accountable for the actions of others inside the building; particularly the violence committed by other defendants in separately charged cases.

Since his arrest, the defendant has been cooperative with law enforcement; at the time of his initial court appearance, he voluntarily unlocked his cell phone. He admitted his guilt to the lead charge against him and agreed to the upward adjustments contained in the Plea Agreement. [3] October 4, 2022, the defendant participated in a virtual interview with staff members of the House Select Committee for several hours. Mr. DeCarlo gave them a narrative of the events that led to his presence at the Capitol on January 6, 2021 and responded to the Committee's questions. He also voluntarily provided them with access to the contents of his electronic devices.

### 3.   *Sentencing To Reflect The Seriousness Of The Offense/Promote Respect For Law/Provide Just Punishment*

In the aggregate, these sentencing factors are aspirational guideposts for the Court to impose what would be considered a fair sentence. There is no doubt that the crime for which defendant Nicholas DeCarlo admitted his guilt is a serious matter; indeed, the January 6 events were a direct attack on this nation's historic commitment to democracy and the peaceful transfer of power after a free and fair election. The defendant now understands more completely the ramifications of his conduct and within the limits of the criminal justice system, has done all that is

---

[3] The Government notes that other defendants have raised the claim that their conduct should be excused because they were acting as "journalists." See DE 93 (Gov't Sentencing Memo) at p. 38, fn. 112. Mr. DeCarlo has not raised that argument before this Court and the Government's reference to what other defendants claimed is irrelevant to this case.

within his power to acknowledge responsibility for his actions. He entered a timely

guilty plea in the case and obviated the need for a trial of the charges against him.

The task of fashioning a sentence to promote respect for the law and to

reflect the seriousness of the offense is in some respects an existential quest. But as

at least one district court judge has noted "it is not always necessary to incarcerate

a defendant to promote such respect and demonstrate the seriousness of the crime."

United States v. Smith, 2009 WL 24917 (N.D. Ohio). What promotes respect for

the law is a fair sentence and under the totality of the circumstances in this case,

the defense believes that the requested sentence of 18 months is fair for this

particular defendant under the particular facts of his case.

### 4.   *Avoiding Unwarranted Sentencing Disparity*

More than 950 persons have been arrested in connection with the events of

January 6, 2021. While many were allowed to plead guilty to misdemeanor

offenses, a significant number of defendants have pled guilty to the same charge

Obstruction charge as defendant DeCarlo; some of them by guilty plea, others after

conviction by a jury. In some instances, the defendants were also convicted of

assaultive conduct and/or other offenses related to their entry into the United States

Capitol. This pool of related defendants does provide this Court with a pool of

other similar cases for purposes of comparison. The following is a chart (based

upon the Government's Sentencing Table submitted on November 1, 2022 in *U.S.*

*v. Yadzani-Isfahani*, 21 Cr. 543) that contains the information concerning

defendants convicted of the obstruction offense:

| Name | Case No./Judge | Charge(s) of Conviction | Gov't Sentence Request | Sentence Imposed By Court |
|---|---|---|---|---|
| Hodgkins, Paul | 1:21-CR-00188-RDM | 18 U.S.C. § 1512(c)(2) | 18 months' incarceration | 8 months' incarceration 24 months' supervised release $2000 restitution |
| Fairlamb, Scott | 1:21-CR-00120-RCL | 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 111(a)(1) | 44 months incarceration, 36 months' supervised release, $2000 fine | 41 months incarceration, 36 months supervised release, $2000 restitution |
| Chansley, Jacob | 1:21-CR-00003-RCL | 18 U.S.C. § 1512(c)(2) | 51 months' incarceration 36 months' supervised release $2000 restitution | 41 months' incarceration 36 months' supervised release $2000 restitution |
| Duke, Wilson | 1:21-CR-345-RCL | 18 U.S.C. § 1512 (c)(2) | 46 months' incarceration | 51 months' incarceration |
| Miller, Matthew | 1:21-CR-00075-RDM | 18 U.S.C. § 1512(c)(2) 18 U.S.C. § 111(a)(1) | 51 months' incarceration 36 month's supervised release | 33 months' incarceration 24 months' probation $2000 restitution 100 hours community service |
| Rubenacker, Greg | 1:21-CR-00193-BAH | 18 U.S.C. § 231(a)(3) 18 U.S.C. § 1512(c)(2) 18 U.S.C. § 111(a) 18 U.S.C. § 1752(a)(1) 18 U.S.C. § 1752(a)(2) 18 U.S.C. § 1752(a)(4) 40 U.S.C. § 5104(e)(2)(D) 40 U.S.C. § 5104(e)(2)(E) 40 U.S.C. § 5104(e)(2)(F) 40 U.S.C. § 5104(e)(2)(G) | 46 months' incarceration 36 months' supervised release | 41 months' incarceration 36 months' supervised release $2000 restitution |

| Robertson, Thomas | 1:21-CR-00034-CRC | 18 USC 1512(c)(2) and 2<br>18 USC 231(a)(3) and 2<br>18 USC 1752(a)(1) and (b)(1)(A)<br>18 USC 1752(a)(2) and (b)(1)(A)<br>40 USC 5104(e)(2)(D) | 96 months' incarceration<br>3 years' supervised release $2,000 restitution<br>$100 special assessment for each count of conviction | 87 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
|---|---|---|---|---|
| Pruitt, Joshua | 1:21-CR-00023 – TJK | 18 U.S.C. 1512(c)(2) and (2) | 60 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 55 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| Michetti, Richard | 1:21-cr-00232 – CRC | 18 U.S.C. § 1512(c)(2) | 18 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 9 months' incarceration<br>24 months' supervised release<br>$2,000 restitution |
| Williams, Anthony | 1:21-CR-00377-BAH | 18 U.S.C. § 1512(c)(2);<br>40 U.S.C.<br>§§ 5104(e)(2)(D) and (G)<br>18 U.S.C. §§ 1752(a)(1) and (2) | 64 month's incarceration<br>36 months' supervised release<br>$2000 restitution | 60 month's incarceration<br>36 months' supervised release<br>$5000 fine<br>$2000 restitution |
| Hale-Cusanelli, Tim | 1:21-CR-00037 - TNM | 18 U.S.C. 1512(c)(2) and 218 U.S.C. 1752(a)(1)<br>18 U.S.C. 1752(a)(2)<br>40 U.S.C. 5104(e)(2)(D<br>40 U.S.C. 5104(e)(2)(G) | 78 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 48 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |
| Reffitt, Guy | 1:21-CR-00032-DLF | 18 U.S.C. § 231(a)(2)<br>18 U.S.C. § 1512(c)(2)<br>18 U.S.C. § 1752(a)(1)<br>18 U.S.C. § 231(a)(3)<br>18 U.S.C. § 1512(a)(2)(C) | 180 months' incarceration 3 years supervised release<br>$2000 restitution | 87 months' incarceration 3 years supervised release<br>$2000 restitution |
| Secor, Christian | 1:21-CR-00157 - TNM | 18 U.S.C. § 1512(c)(2) | 57 months' incarceration<br>36 months' supervised release<br>$2,000 restitution | 42 months' incarceration<br>36 months' supervised release<br>$2,000 restitution |

| Bledsoe, Matthew | 1:21-CR-00204 – BAH | 18 U.S.C. § 1512(c)(2) 18 U.S.C. § 1752(a)(1) 18 U.S.C. § 1752(a)(2) 40 U.S.C. § 5104(e)(2)(D) 40 U.S.C. § 5104(e)(2)(G) | 70 months' incarceration 36 months' supervised release $2,000 restitution | 48 months' incarceration 36 months' supervised release $2,000 fine $2,000 restitution |
| Seefried, Hunter | 1:21-CR-00287 – TNM | 18 U.S.C. § 1512(c)(2) and 2 18 U.S.C. § 1752(a)(1) 18 U.S.C. § 1752(a)(2) 40 U.S.C. § 5104(e)(2)(D) 40 U.S.C. § 5104(e)(2)(G) | 64 months' incarceration 36 months' supervised release $2,000 restitution | 24 months' incarceration 12 months' supervised release $2,000 restitution |

Three separate defendants – Greg Rubenacker, Anthony Wiliams, and Matthew Bledsoe – have appeared before this Court for sentencing on the obstruction and related charges. In each instance, this Court imposed a sentence lower than the Government's request, even though *Williams* and *Bledsoe* were convicted at trial and *Rubenacker* was personally involved in a close quarter physical altercation with a police officer. Each of these cases supports the argument that the Government's requested sentences are outside (that is to say, higher) than the appropriate sentencing range.

In addition, several defendants who participated in actual violence received less jail time than the Government requested in this case. The following discusses in some detail each defendant's actual conduct, to place into context the sentence they received, in comparison to this case.

**Matthew Miller** – the defendant was sentenced to **33 months** in jail, when the Government requested 51 months. This is the summary of his conduct from the Department of Justice press release issued after the sentencing:

As a mob gathered on the West side of the U.S. Capitol on Jan. 6, Miller threw a full beer can in the direction of the Capitol building and police protecting it. At the time, he was draped in a Confederate flag. Miller then used a section of temporary barriers as a ladder to scale the walls of the west side of the plaza.  He also assisted other rioters in scaling the walls and other architectural obstacles. Miller and others then moved to the Lower West Terrace and close to the tunnel area leading into the building. Miller waved his hand, and said multiple times, "Come on," as the mob chanted "Heave! Ho!" and rocked back and forth in pushing towards the tunnel entrance that law enforcement officers were attempting to secure. Multiple times, Miller put up his fingers and yelled, "one, two, three, push!" From this position, he also threw batteries towards the Lower West Terrace tunnel, where police were guarding the entrance to the Capitol building. Then, at about 4:55 p.m., and at his closest position to the tunnel, Miller used a fire extinguisher to spray directly into the tunnel onto police officers; several officers were impacted by this assault.

**Scott Fairlamb** – the defendant was sentenced to **41 months** of incarceration, when the Government requested 44 months.  This summary of his conduct is taken from the Government's sentencing memorandum in the case:

Fairlamb, a former Mixed Martial Arts ("MMA") fighter, joined the storming of the police line on the West Terrace, obtaining a police baton, and screaming "What Patriots do? We fuckin' disarm them and then we storm the fuckin' Capitol!" Fairlamb then brandished that same police baton while entering the U.S. Capitol through the Senate Wing Door, which had been kicked out by rioters who entered through a broken window, just one minute before Fairlamb's entry. After exiting the U.S. Capitol, Fairlamb aggressively followed a line of dramatically out-numbered Metropolitan Police Department ("MPD") officers, screaming vitriol at them as they attempted to traverse the over-run Terrace. After isolating an MPD officer from his fellow officers, Fairlamb shoved the officer and then punched his face shield. Two days after the riot, on January 8, Fairlamb filmed a chilling video threatening future violence, stating, "they pulled the pin on the grenade, and the blackout is coming. What a time to be a patriot," and, immediately after being visited by FBI agents on January 15, 2021, said that he would "go again" to the U.S. Capitol

**Christian Secor** – the defendant received a sentence of **42 months,** when the Government requested 57 months. The defendant entered the Capitol building by scaling the scaffolding in place for the inauguration, then made his way to the Speaker's office suite and finally to the East Rotunda doors. According to the Government's sentencing memorandum, thereafter, a "group of approximately 30 rioters threw their weight against the doors, which Secor joined by bracing his body against the backs of other rioters as they pushed. In the process, the crowd trapped three Capitol Police officers against the doors. The rioters ultimately overpowered the officers, and Secor and his fellow rioters assisted the rioters on the outside of the Capitol enter the building." The defendant was a self-avowed white nationalist.

**Seefried Hunter** – the defendant received a sentence of **24 months**, when the Government asked for 64 months. He was convicted, along with other family members, after a non-jury trial. The Government's evidence established that the defendant verbally confronted Capitol Hill police officers near the entrance to the Senate chambers.

### 5.  *Specific and General Deterrence/Prevent Future Crimes*

The factor of specific deterrence also supports the requested below guidelines sentence in this case. The defendant has written this court a letter that is being submitted with this sentencing memorandum. In the letter, he admits his involvement in the case and expresses remorse for his actions on January 6, 2021. The defendant pled guilty, agreed to the Government's Statement of Facts, and agreed to pay Restitution in the amount of $2,000.00. The defendant recently lost his employment in Tennessee because of the criminal charges against him and is

now virtually impecunious, living at home with his parents. [4] The sentence requested by the defense would constitute sufficient specific deterrence.

With respect to general deterrence, the Government has indicted almost a thousand persons in connection with the January 6, 2021, events at the Capitol. The charges range from misdemeanor trespassing to insurrection and there is no need to subject Mr. DeCarlo to any additional punishment in order to send a message to others that any similar conduct in the future will be met with even more exacting punishment.

## CONCLUSION

The sentencing of any person is a complex task for the Court. Through the submission of this memorandum, the defense has tried to provide context to assist the Court in imposing a sentence that satisfies the requirements of the law and our notions of justice. For all the reasons set forth in this memorandum, the defense asks this Court to grant a downward variance and sentence defendant Nicholas

---

[4] The Government notes that the defendant had a "go fund" me page in order to raise money for his legal defense, which collected $7,096.00. See Gov. Memo at p. 47. The defendant has advised that a portion of the funds were used to pay his prior attorney and that nothing is left in the account. Given Mr. DeCarlos' financial situation, the defense asks this Court not to impose a fine in this case.

DeCarlo to a period of incarceration of 18 months.

Respectfully submitted,

*Robert Feitel*

_____

Robert Feitel, Esquire
1300  Pennsylvania Avenue, N.W.
Washington, D.C.  20008
D.C. Bar No. 366673
202-450-6133 (office)
202-255-6637 (cellular)
RF@RFeitelLaw.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was filed with this Court and sent via ECF to Alexis Loeb, United States Attorney's Office for the District of Columbia (detailee) and Edward McMahon, counsel for co-defendant Nichols Ochs, Samantha Thompson, Trial Attorney, Narcotic and Dangerous Drug Section, Washington, D.C. this 29th day of November, 2022.

*Robert Feitel*

_____

Robert Feitel